IN THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY


VR HOLDINGS, INC.                             *
1615 Chester Road
Chester, Maryland 21619                        *

      Plaintiff                          *

v.                                             *          CASE NO.: 16063

MARSHALL & ILSLEY TRUST COMPANY      *
770 North Water Street
Milwaukee, WI 53202                            *
      Serve on:
      G&K Wisconsin Services L.L.C        *
      780 N Water St
      Milwaukee , WI 53202               *

and                                            *

VENABLE, L.L.P.                                *
750 E. Pratt Street, Ste. 900
Baltimore, MD 21202                            *
      Serve on:
      The Corporation Trust Inc.         *
      351 W. Camden Street
      Baltimore, MD 21201                *

      Defendants                         *

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

COMPLAINT

    NOW COMES, VR Holdings, Inc., by and through their attorneys, Robert B. Morris,

Esquire, Barry L. Dahne, Esquire, and Tara K. Frame, Esquire, and sues Marshall & Ilsley Trust

Company and Venable, L.L.P., stating the following:

    1.    Plaintiff, VR Holdings, Inc. ("VRH"), is Delaware Corporation with its principal

office in Chester, Maryland.

1

2.     Transcolor Corporation ("Transcolor"), Valley Rivet Company, Inc., and MML, Inc. were wholly owned subsidiaries of VRH.

3.     Transcolor Corporation, Valley Rivet Company, Inc., and MML, Inc. have each assigned all assets, liabilities and claims that they may have against the Defendants to VRH.

4.     MML, Inc. is a Maryland Corporation with its principal offices located in Chester, Maryland and is a wholly owned subsidiary of VRH.

5.     Defendant, Marshall & Ilsley Trust Company ("M&I"), is a Wisconsin Corporation, with its principal place of business in Milwaukee, Wisconsin, and is the successor in interest to NCB.  (NCB was merged with M&I).

6.     National City Bank of Minneapolis ("NCB") was the Indenture Trustee, who merged into Defendant M&I.

7.     Defendant, Venable, L.L.P. ("Venable") is a Maryland law firm, with offices in Baltimore, Maryland.

8.     Cerberus Capital Management, L.P. ("Cerberus") was a former lender to Winterland Concessions Company ("Winterland"), which was a former subsidiary of MML, Inc.

9.     Madeleine Corporation ("Madeleine") is a subsidiary of Cerberus and a former lender to Winterland.

10.     Gordon Brothers Capital was a lender to Winterland.

11.     There are two thousand (2,000) senior Note holders of Alleco, Inc. and Transcolor Corporation, who reside in twenty-six (26) states and who have been harmed by the actions of the Defendants alleged herein.

12.     M&I, and its predecessor NCB, committed a tort against each of the two thousand (2,000) Senior Note holders, one of whom resides in Chester, Maryland.

2

13.     Since there is more than one Defendant and no common venue among the various parties a suit may be brought in any court in which the case could be brought against any one Defendant.

GENERAL ALLEGATIONS

14.     The Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 13 as if fully set forth herein.

15.     In December 1995, the CEO of MML, Inc. and the affiliated companies and the in-house counsel traveled to Seattle, Washington to review a potential acquisition.  During the meeting the CEO of MML, Inc. suffered two grand mal seizures and was taken to the hospital.  As a result, for the subsequent six months he had difficulty communicating and in-house counsel was the go between for the CEO and the organization.  The CEO of MML, Inc. was inactive for a long period of time.

16.     In March of 1998, the CEO of MML, Inc. was diagnosed with pancreatic cancer. Believing that he did not have long to live, he sent a memorandum to in-house counsel suggesting arrangements to handle the management of the corporations in the event he died.

17.     After many years and multiple treatments, the CEO of MML, Inc. was able to make a full recovery.  During the CEO's cancer treatment, various transactions took place involving VRH, Valley River, Transcolor, Alleco, Inc., MML, Inc. and Winterland.

18.     Winterland Concessions was a company owned by Music Corp. of America, which in turn was owned by Seagrams.  Winterland executives approached Transcolor executives to determine their interest in purchasing Winterland.  The purchase was completed in August 1996 when MML, Inc., the parent company of Transcolor, arranged a Six (6) Month Bridge Loan with Cerberus and Gordon Brothers Capital.

3

19.     From the first day after the settlement, Cerberus harassed the executives of Winterland, Transcolor, and MML, Inc.

20.     In spite of that problem, the Winterland/Transcolor group earned $10 million in five and half months and repaid that amount of the loan.  The only financial difficultly was that the Six (6) Month Bridge Loan showing as a current liability had to be repaid or refinanced.

21.     Cerberus and Gordon Brothers Capital (the lenders) recognized what a good acquisition Winterland was and determined that they would find a way to take over ownership. They arranged for the Chief Financial Officer of Transcolor and Winterland to take steps to cause a default, which he did. He admitted to agreeing to taking a bribe and causing a default in February 1997, when he was confronted by in-house counsel and the CEO of MML, Inc and Transcolor Corporation.

22.     With the Winterland loan in default, an agreement was entered into titled "Comprehensive Settlement and Shareholders Agreement" dated April 11, 1997 (hereinafter referred to as "Settlement and Shareholders Agreement") between the affiliated companies and the lenders.  The ownership would be reversed with the lenders owning 80% and MML, Inc. owning 20%.  For the period of one year, the lenders were not to be involved, and, on the condition that when and if the loan was repaid in full, within the one year period, the lenders would convey their 80% of stock back to MML, Inc.  The agreement provided that MML, Inc. had a one year period to accomplish the repayment of the loan.

23.     The lenders purportedly never planned to abide by the agreement, and three months later, after Winterland earned another $1 million, the lenders placed Winterland in bankruptcy and Winterland publicly stated that the reason for the filing was to eliminate the Settlement and Shareholders Agreement.  This act caused the demise of all affiliated companies,

4

damage to all two thousand (2,000) Senior Note holders, and five hundred (500) investors and creditors.

24.     MML, Inc. and Transcolor's attorneys and executives notified the Indenture Trustee of the improper actions of the lenders, and NCB agreed in 1997 to not take any action against Alleco or Transcolor for three (3) years, during which time Transcolor and/or the affiliated companies would file actions against the lenders.

25.     The lenders' actions in a conspiracy with the Indenture Trustee (NCB, now M&I) caused Transcolor to go into bankruptcy, because they would not be receiving the $1.4 million that they had been receiving annually from Winterland.  Documents exist showing the contact between NCB and the lenders.

26.     Part of the plan was to eliminate all opposition.  The lenders terminated the in-house counsel and, in cooperation with the Indenture Trustee, NCB, forced Transcolor into bankruptcy.

27.     In 1999, National City Bank of Minneapolis (NCB), to which M&I is the successor-in-interest, violated its 1997 Agreement with MML, Inc. and Transcolor management by reversing its position and suing Transcolor, Alleco, and their CEO, who was inactive at the time, alleging that Transcolor violated the Trust Indenture by leasing certain assets and selling inventory-in-process (open ink cans) to Winterland.  NCB also alleged that the ill CEO was an alter ego of Transcolor.  NCB was successful on this issue, despite a recent California court ruling to the contrary.

28.     MML, Inc., Transcolor, and its attorneys at the time, had convinced NCB that the real culprits were Cerberus, Madeleine, and Gordon Brothers Capital, who had breached the April 1997 "Settlement and Shareholders Agreement" with MML, Inc. pursuant to which MML, Inc.

5

was given another twelve (12) months to arrange long-term financing for Winterland and to regain control of Winterland.

29.     NCB agreed to allow Transcolor three (3) years within which to sue Cerberus, Madeleine, and Gordon Brothers in order to recover damages that would cure Transcolor's default with respect to the Notes.  NCB and its successor-in-interest, M&I, abided by this agreement for two (2) years, but then forced Transcolor into bankruptcy in Maryland, as described above.  It was within the context of that bankruptcy that M&I brought the adversary proceeding against the CEO of MML, Inc personally and Transcolor Corporation.

30.     In 1999, M&I represented by Venable, brought an adversary proceeding against the CEO of MML, Inc. in the Transcolor Corp. bankruptcy then pending in United States Bankruptcy Court for the District of Maryland, alleging that the CEO of MML, Inc. was the alter ego of Transcolor Corp. and caused it to engage in fraudulent transactions involving Winterland Concessions Company.  A $ 7 million judgment was entered against the CEO of MML, Inc. personally in favor of M&I in the U.S. Bankruptcy Court for the District of Maryland.

31.     M&I, still represented by Venable, sought to execute upon the judgment in the Bankruptcy Court by seizing the CEO's real property in Annapolis, Maryland.  The CEO's attorneys filed a motion to the effect that, if the CEO was liable to M&I, then Venable was also liable because it had breached its fiduciary duty to the CEO of MML, Inc.

32. Venable had represented the CEO of MML, Inc. and his companies for many years from 1970 through 1985 and had represented the CEO of MML, Inc. personally in preparing his prenuptial agreement with his spouse and a related deed which conveyed the property from the CEO to the CEO and his spouse as tenants by the entirety in 1978.

33.     The agreement and deed were highly relevant to the attempt to seize the property. If the property was held by the CEO and his spouse as tenants by the entirety, M&I could not attach it. In the bankruptcy proceeding, Venable argued that the property was not owned by them as tenants by the entirety and was therefore subject to attachment, even though Venable's managing partner at the time, Jacques Schlenger, prepared the paperwork upon which Venable was proceeding and upon which property Venable was seeking to execute. Venable knew, or should have known from a review of the public records, that the property was properly held as tenants by the entirety and was, therefore, not attachable.

34.     The bankruptcy court dismissed the execution proceeding for lack of jurisdiction, stating that ownership of the property was a matter of Maryland state law and should be decided by the Maryland court in which the real property was located.

35.     Venable, realizing that it had a conflict, retained an Annapolis law firm to represent M&I in the lawsuit that would be filed in Anne Arundel County Circuit Court. Notwithstanding its conflict, Venable forwarded its files, documents and work product to the Annapolis law firm.

36.     The complaint filed in Anne Arundel Circuit Court was practically a carbon copy of what had been filed by Venable in the bankruptcy proceeding.

37.     Prior to the filing of the Anne Arundel lawsuit, the CEO's counsel showed Venable documents relating to transactions involving the ownership of the property that occurred subsequent to the execution of the prenuptial agreement and the original conveyance of the property in 1978. These subsequent transactions established beyond doubt that the property was owned by the CEO and his spouse as tenants by the entirety.

38.     Nevertheless, in November of 2008, M&I filed its lawsuit in the Circuit Court for Anne Arundel.  In April of 2010, the Circuit Court granted the CEO and his spouse's Motion for Summary Judgment, suggesting strongly that M&I had no grounds for bringing the suit.  M&I did not appeal that judgment.

COUNT I
(Civil Conspiracy)

39.     The Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 38 as if fully set forth herein.

40.     Venable was in confederation when they agreed to represent M&I against certain subsidiaries of VRH and its CEO.  Venable's action constituted negligence and a breach of fiduciary duty when it agreed to represent M&I to pursue a lawsuit against the VRH subsidiaries and its CEO.

41.     NCB, and its successor-in-interest, M&I, conspired to bring action against Transcolor Corporation violating the Settlement and Shareholders Agreement made in 1997.  This violation caused Transcolor Corporation to go into bankruptcy, thereby causing the demise of the various former subsidiaries of VRH and the loss to the Senior Note holders and Shareholders of those various companies.  These actions continued throughout the years with NCB and M&I eventually bringing suit against the CEO of MML, Inc. and his spouse personally in 2008.

42.  That the Defendants actions constituted tortious aiding and abetting, negligence, breach of fiduciary duty, intentional misrepresentation and negligent misrepresentation.  The conspiracy between the Defendants continued through 2008, when the action was brought in the Circuit Court for Anne Arundel County against the CEO of MML, Inc. and his spouse.

WHEREFORE, Plaintiffs, VR Holdings, Inc., on behalf of all damaged parties, demand judgment against Defendants, M&I and Venable, in the amount of One Billion Six Hundred Million Dollars ($1,600,000,000) in compensatory damages, plus punitive damages and legal fees.

## COUNT II
(Tortious Aiding and Abetting)

43.    The Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 42 as if fully set forth herein.

44.    NCB and M&I, as its successor-in-interest, knew that Venable breached its fiduciary duty to the CEO of MML, Inc., while the Maryland bankruptcy proceeding was still in progress and well before the Anne Arundel County state action was brought.  The CEO and his spouse filed a Motion to the effect that if the CEO and his spouse owed money to M&I, then Venable does as well, because of its conflict of interest.

WHEREFORE, Plaintiffs, VR Holdings, Inc., on behalf of all damaged parties, demand judgment against Defendants, Venable and M&I, in the amount of One Billion Six Hundred Million Dollars ($1,600,000,000) in compensatory damages, plus punitive damages and legal fees.

## COUNT III
(Breach of Fiduciary Duty)

45.    The Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 44 as if fully set forth herein.

46.    M&I breached its fiduciary duty to the Note holders by expending its time and resources pursuing the CEO of MML, Inc. personally long after it knew or should have known that a judgment against the CEO of MML, Inc. could not be satisfied by seizing real property

owned as tenants by the entirety.  Instead, M&I should have aggressively pursued Cerberus, Gordon Brothers Capital, and Madeleine.

47.     Venable violated the Maryland Professional Rules of Conduct when they agreed to represent M&I against the VRH subsidiaries and its CEO, whom they had personally represented previously, as well as his companies, for many years and had prepared the CEO's prenuptial agreement with his spouse and deed transferring the real property.  Venable owed the CEO of MML, Inc. a fiduciary duty as a previous client to preserve his confidences, but nevertheless agreed to represent M&I adverse to the CEO of MML, Inc. and his spouse's interests.

WHEREFORE, Plaintiffs, VR Holdings, Inc., on behalf of all damaged parties, demand judgment against Defendants, Venable and M&I, in the amount of One Billion Six Hundred Million Dollars ($1,600,000,000) in compensatory damages, plus punitive damages and legal fees.

## COUNT IV
### (Negligence)

48.     The Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

49.     NCB, and M&I, as the successor-in-interest, had a duty of care to the Note holders to take timely and effective actions on their behalf to recover funds to the Notes.  NCB and M&I, as the successor-in-interest, breached this duty by failing timely to pursue Cerberus, Madeleine and Gordon Brothers Capital, but instead engaging in a futile effort to recover from the CEO of MML, Inc. until any claims against the three tortfeasors were barred by the statute of limitations.

WHEREFORE, Plaintiffs, VR Holdings, Inc., on behalf of all damaged parties, demand judgment against Defendant, M&I, in the amount of One Billion Six Hundred Million Dollars ($1,600,000,000) in compensatory damages, plus punitive damages and legal fees.

## COUNT V
### (Intentional Misrepresentation)

50.     The Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 49 as if fully set forth herein.

51.     Moreover, in June 2000, M&I solicited the Note holders to provide money to fund M&I's efforts to pursue the CEO of MML, Inc., but failed to disclose that (i) the action against the CEO of MML, Inc. lacked substantial justification and (ii) M&I had failed to pursue the most likely sources of recovery of funds, namely Cerberus, Madeleine, and Gordon Brothers Capital.  The Note Holders were deceived into thinking that M&I was taking diligent and effective action on their behalf to recover funds and were induced not to take action against the Indenture Trustee (including but not limited to removal of the Trustee) for failing to perform its duties to them under the Trust Indenture.

52.     M&I represented to the Note holders in the Trust Indenture that it was subject to and in compliance with banking and other regulations and that therefore it had the financial resources and institutional soundness to continue to serve as the Indenture Trustee at a time when it needed to proceed aggressively during 1997-1999 in order to recover funds on behalf of the Note holders.  M&I failed to disclose to the Note holders that it had accepted a substantial amount of TARP funds and was in fact an impaired institution that was not financially qualified to continue serve as the Indenture Trustee.

53.     NCB and its successor-in-interest, M&I, made false statements with intention that the Plaintiff's and their assignors would act or rely upon the negligent assertions.  Plaintiff's and their assignors relied on the false statements made by NCB and its successor-in-interest, M&I. Because of this reliance, Plaintiff's and their assignors incurred damages.

WHEREFORE, Plaintiffs, VR Holdings, Inc., on behalf of all damaged parties, demand judgment against Defendant, M&I, in the amount of One Billion Six Hundred Million Dollars ($1,600,000,000) in compensatory damages, plus punitive damages and legal fees.

## COUNT VI
(Negligent Misrepresentation)

54.     The Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 53 as if fully set forth herein.

55.     NCB and M&I, its successor-in-interest, represented to the Note holders in the Trust Indenture that it was subject to and in compliance with banking and other regulations and that therefore it had the financial resources and institutional soundness to continue to serve as the Indenture Trustee at a time when it needed to proceed aggressively during 1997-1999 in order to recover funds on behalf of the Note holders.  M&I failed to disclose to the Note holders that it had accepted a substantial amount of TARP funds and was in fact an impaired institution that was not financially qualified to continue serve as the Indenture Trustee.

56.     Moreover, in June 2000, M&I solicited the Note holders to provide money to fund M&I's efforts to pursue the CEO of MML, Inc., but failed to disclose that (i) the action against the CEO of MML, Inc. lacked substantial justification and (ii) M&I had failed to pursue the most likely sources of recovery of funds, namely Cerberus, Madeleine, and Gordon Brothers Capital.  The Note Holders were deceived into thinking that M&I was taking diligent and effective action on their behalf to recover funds and were induced not to take action against the Indenture Trustee (including but not limited to removal of the Trustee) for failing to perform its duties to them under the Trust Indenture.

12

57.   NCB and its successor-in-interest, M&I, made false statements with intention that the Plaintiff's and their assignors would act or rely upon the negligent assertions.  Plaintiff's and their assignors relied on the false statements made by NCB and its successor-in-interest, M&I. Because of this reliance, Plaintiff's and their assignors incurred damages.

WHEREFORE, Plaintiffs, VR Holdings, Inc., on behalf of all damaged parties, demand judgment against Defendant, M&I, in the amount of One Billion Six Hundred Million Dollars ($1,600,000,000) in compensatory damages, plus punitive damages and legal fees.

Respectfully submitted,

Robert B. Morris
165H Log Canoe Circle
Stevensville, MD  21666
(443) 527-9111
Attorney for Plaintiffs

Barry L. Dahne
165H Log Canoe Circle
Stevensville, Maryland 21666
(443) 527-9111
Attorney for Plaintiffs

Tara K. Frame
165H Log Canoe Circle
Stevensville, Maryland 21666
(410) 643-2202
Attorney for Plaintiffs

13

## REQUEST FOR JURY TRIAL

The Plaintiffs hereby request that this matter be tried before a jury.

_____
Robert B. Morris
165H Log Canoe Circle
Stevensville, MD  21666

_____
Barry L. Dahne
165H Log Canoe Circle
Stevensville, MD  21666

_____
Tara K. Frame
165H Log Canoe Circle
Stevensville, Maryland 21666

14